## USE OF  FUNDS RAISED FOR WORLD WAR VETERANS.

Common Pleas Court of Knox County.

THE AMERICAN LEGION v. CHARLES F. COLVILLE ET. AL.

Decided May, 1925.

*Charities—Cy Pres Doctrine Applied—In Case of a Fund Raised By Local Subscription for the American Soldiers.*

The unexpended balance of a fund raised by subscription within the county and placed in the hands of representative citizens to be used for the benefit of American soldiers and sailors, cannot now be designated as a "community trust fund" and turned over to trustees with authority to expend the income therefrom to "foster local unity and promote the patriotic, esthetic, moral, spiritual, intellectual and educational" well being of the public of the county, but under the *cy pres* doctrine must be preserved as nearly as may be for its intended beneficiaries; and in order to carry out that purpose the court orders that the fund be placed in the hands of three ex service men, who will be expected to give bond and serve without compensation, with authority to use the income therefrom for relief of distressed conditions among soldiers and sailors of the county and of our recent allies, special attention being given to those suffering from mental and physical troubles brought on by service to the country, the balance of said net income to be devoted to the ex service men and their various organizations within the county.

BLAIR, J.

At a hearing in this case on April 15, 1924, more than a year ago, the court made an order that a trustee be appointed for the funds in controversy. This order was entered upon the trial docket, and the parties were instructed to confer, with a view of agreeing upon a suitable person to act as such trustee—the court desiring to avoid the appointment of a person who for any reason was objectionable to any of the parties. On numerous occasions since the making of such order the court has called this matter to the attention of the attorneys, always to be met with the answer that the parties were negotiating, and hoped soon to be able to arrive at a complete understanding fully disposing of the matter, and make such report to the court. All efforts to agree upon

a disposition of the matter however, which would meet with the approval of the court, have failed. In fact, the tentative agreement submitted for the approval of the court is such that I feel no court could approve of it. I therefore determined to dispose of this matter without further delay, and I find that the pleadings filed in the case contain amply sufficient *undisputed facts* to warrant the court in making final disposition of the case.

The *undisputed facts* disclosed by these pleadings are as follows, stated briefly:

During the last year of the World War a large amount of money was raised by subscription among the citizens of this county, and paid into a fund known as "The United War Work Campaign Fund," to be used for the benefit of the American soldiers and sailors—such fund being placed in the hands of a committee of representative citizens of the county. The greater portion of this fund was expended by this committee for the benefit of our soldiers and sailors, and the preservation of the morale of our armies, in accordance with the purposes for which such fund had been subscribed. At the close of hostilities this committee had on hand a balance of such fund amounting to about six thousand ($6,000) dollars. About two thousand dollars of this balance was afterwards expended by this committee for the relief of the suffering Armenians, leaving a balance of four thousand ($4,000) dollars still in their hands undisposed of. On February 7, 1920, this committee turned this balance of $4,000 over to the defendants, Ralph C. Ringwalt, Perry L. Cover and L. G. Simpson, as trustees under a so-called deed of trust, which deed was signed by most, but not all, of the members of such committee. In this so-called deed of trust this fund is given the name of *"The Community Trust Fund of Knox County."* —the deed specifying the purposes to which such fund should be devoted, most of which purposes, if not all, being wholly dissimilar, entirely foreign to, and in no way connected with any of the purposes for which said fund had been created; and these trustees now hold this fund, insisting upon the legality of their title, and their right to hold and administer the

same, under this so-called deed of trust. After declaring that the fund shall be known as "*The Community Trust Fund of Knox County,*" and providing for the preservation of the principal, this so-called deed of trust authorizes such trustees to expend the income therefrom in such manner as "*To Foster the Unity of Knox County—*and *so as to promote the patriotic, esthetic, moral, spiritual, intellectual and educational well-being of the people of said county.*"

This instrument of conveyance, the court holds, is void and of no effect whatever, either in law or in equity, and the so-called trustees acquired no right, title or interest, in or to such fund, by virtue of such deed.

· Such conveyance is void and of no effect, for the following reasons:

FIRST: This committee had no power or authority, either in law or in equity, to convey or pass title to this fund to any person or persons, for any purpose whatever, or in any way designate or appoint their successors as trustees of this fund, or to dispose of it in any manner or for any purpose, except to use it for the purpose for which it was subscribed.

SECOND: This deed is void because such conveyance undertakes to divert the fund from the purposes for which it was created, and to apply it to other entirely dissimilar purposes, not in any way connected with or related to any of the purposes for which it was created.

THIRD: This deed is void for *indefiniteness and uncertainty* in declaring the purposes for which such fund should be used, as well as the whole declaration of trust.

. We will consider these three reasons, brifly, in the inverse order in which they appear above:

*As to Indefiniteness and Uncertainty.*

The name by which this fund is to be designated and known— "The Community Trust Fund of Knox County", would indicate that it could be used for any purpose concerning the community. The various things which might be undertaken in order "*to foster the unity of Knox County*" are so multitudinous that it is hardly conceivable that any two persons could agree upon the expenditure of this fund for any definite undertaking. It is altogether possible that it could be expended

in an endeavor to unite the people upon some great religious or educational question upon which the trustees might think there should be "unity", providing the trustees themselves could agree.

Under this declared "trust," should the acting trustees or their successors lay special stress upon *"the patriotic well being of the people of the county,"* it is altogether probable that this money might be spent in teaching the children of the county "patriotism," impressing their young minds with the importance of always being ready and willing to subscribe freely to a fund designed to lighten the burdens and sufferings of our soldier boys. In such case, however, it should be stated, in fairness to the children, that the committee in charge of such fund would reserve to themselves the right to use such fund for any purpose which might appeal to them, or suit their peculiar fancy.

Under this trust deed, should this fund fall into the hands of trustees strong on *"esthetics,"* it might be spent in teaching the people of the county the importance of beauty, taste, and the finer arts, including theatrics, music and the dance.

Were the trustees in charge long on *"morals,"* this money might be spent in fighting the evils of short skirts, and of bobbed hair. In the opinion of some, the cigarette and tobacco habits are evils tending to lower the morals of our young, and these, together with many other moral evils, might command the attention of the trustees.

Should the trustees presiding over this fund be of the intensely "religious" type, the money might be spent in hiring a lobbyist to secure the passage of laws in the interest of "religion," such as the "Bible Bill," and other bills calculated to make the people be good.

However, if those in charge of this fund under this so-called deed of trust were only concerned with the *"intellectual and educational well being of the people of the county,"* it would not be surprising should they find themselves in need of an "efficiency expert," to discover the most effective methods of spending this money in the development of our people along these lines.

I am not unaware of the fact   that this discussion has led us to the ridiculous—but *there* is just where this so-called deed of trust has led these trustees.   Notwithstanding the very broad and comprehensive purposes enumerated in this deed—so broad and comprehensive as to permit the application of this fund in a thousand different ways, these trustees have done nothing in the way of executing this trust except to preserve the fund and its accumulations.   This inactivity of the trustees in my opinion is attributable solely to the indefiniteness and uncertainty of this deed of trust—so indefinite and uncertain as to preclude any probability of any set of trustees ever being able to agree upon any feasible plan of administering such fund.

For more than five years, three capable, public-spirited business men, having this matter in charge, have permitted this fund to lie dormant, and have done nothing other than to add the interest to the principle.   And for what purpose eventually?   Surely no one knows.   Should this nation become involved in another war, no part of this fund could be used for the relief of our soldiers, if this deed be permitted to stand. It would require a great stretch of the imagination to construe such deed as authorizing the expenditure of any portion of this fund for any purposes connected with warfare—although these were the purposes for which it was created in the first instance.

*As to Authority of Committee to Convey, Power of Appointment, Succession, etc.*

By assuming charge of this fund the members of this original committee became trustees, and their rights, duties and liabilities with reference to such fund, are governed by law.   They acquired no beneficial interest in such fund, and possessed no power or authority except that expressly given or necessarily implied.   No principle of our law is better established than that "a trustee has no power or authority to designate his successor or delegate his authority, unless such power be expressly given by the creators of such trust," (in the instant case the subscribers or donors of such fund).   This is not only man-made law, but it is God-made law, as well.   The obligation to "render an account of thy stewardship" can not be fulfilled by shifting the burden and responsibility to other shoulders.

*As to Diversion of Fund—Powers of Comittee—of. Courts of Chancery.*

. 'An examination of this so-called deed of trust shows a complete diversion of the fund from the purposes for which it was created to other distinct and dissimilar purposes, not in any way related to or connected with any of the original purposes of such fund. There is a principle of law that where a trust fund can not be used for the exact purpose for which it was created, or in the exact manner intended, it may be made available for another similar and closely related purpose, or expended in a somewhat different manner, calculated to accomplish the original purpose as nearly as may be. However, the power of approximation is vested in the courts, and not in the trustees. This power of approximation is exercised by a court of chancery, when the necessity therefor be shown, under what is known as The *cy pres* doctrine, which is defined as being "The power of a court of equity to substitute for a particular charity which has failed, another of the same kind, as nearly as may be—the term "*cy pres*" meaning "as nearly as may be." A court of chancery however is powerless to direct or approve a complete diversion. The attempted diversion by some of the members of this committee, therefore, must necessarily be held to be void and of no effect.

*Disposition of Remaining Portion of This Fund.*

In determining the disposition to be made of the balance of this fund we must keep in mind always the purpose of its creation. The official subscription card used in raising this fund specified the various organizations among which the fund should be divided.

The names of these various organizations are as follows:

"National War Work Council of The Young Men's Christian Association."
"War Work Council of The National Board of The Young Women's Christian Association."
"National Catholic War Council (Knights of Columbus.)"
"Jewish Welfare Board."
"War Camp Community Service."
"American Library Association."
"Salvation Army."

These seven organizations, at the time this fund was created, were engaged in doing welfare work among the American soldiers, both at the front and in camps, as well as among the sailors, providing these men with some added care and comforts to the bare necessities furnished by the government; relieving their sufferings both in body and mind; furnishing them wholesome recreation and amusements, as well as looking after their spititual welfare. In other words, they were "Good Samaritans" to the American soldiers and sailors, and this fund was to be distributed among them to enable them to carry on this work effectively. It was a matter of common knowledge—known to every subscriber to this fund—that the same was raised *for the benefit of the American soldiers and sailors of the World War.* This was preached from the pulpit, emphasized by the press and proclaimed by public speakers, in the "drive" to raise the fund.

While active warfare has ceased, the great majority of these soldiers and soldiers still live, many of them still suffering even more than they did on the "battle front" and in camps. A number of these human wrecks have come to my attention in this county within the last few years—mostly cases of mental trouble brought on as a result of being "gassed," or from other hardships of warfare. *There is every reason why the remainder of this fund should be preserved for the benefit of these intended beneficiaries, and that will be the order of this court.* No part of the principal of such fund shall be consumed, however, except upon the order of this court, duly entered upon its journal, after a public hearing had upon application therefor—ten days' notice of such hearing having been first given through the newspapers of the county. No such order of court shall be made, however, unless urgent necessity for such expenditure shall be made to appear, as a means of carrying out the underlying purposes of this trust. Nothing, however, in this decree, shall curtail or limit the powers of the court over this fund, in the event this nation should become involved in another war.

The net income from this fund shall be used first to relieve distressed conditions which may be found among the soldiers and sailors of this county, and those who may be found within

its borders, and such relief may be extended so as to include soldiers and sailors of our recent Allies, special attention being given to those suffering from mental and physical troubles brought on as a result of their service to their country. The balance of such net income (if any) to be devoted to the general betterment of the ex-service men, and their various organizations of the county, and with this purpose in view such net balance may be distributed or apportioned to the various American Legion Posts of the county, annually, in proportion to their respective memberships or needs, as the trustees (to be appointed) shall determine.

With a view of securing trustees strictly in sympathy with the purposes of this trust, three ex-service men, preferably members of The American Legion, will be tendered such appointments. Trustees to give bond, and to serve without compensation; keep accurate accounts, and file same with court every two years.

While it has not been possible, from a legal standpoint, to justify the original committee in its application of a portion of this fund to the relief of the Armenians, I find that such expenditure was for a most worthy cause, and no doubt the committee, in so doing, acted in perfect good faith, honestly believing they were doing their duty: and for these reasons this payment will not be disturbed by this court. In further justice to the men composing this committee, I am impelled to add that I have implicit faith in their integrity and honesty of purpose, and can only conclude that in executing the so-called deed of trust they acted ill-advisedly, and under a misconception as to their rights and duties in reference to such fund.

As soon as suitable men can be secured, who are willing to accept the trust, and give bond, an entry will be placed upon the journal of this court appointing them as trustees of this fund, in accordance with this finding, and the acting trustees directed to turn over such fund to such newly appointed trustees.

From the funds thus turned over, the newly appointed trustees will be directed to pay the costs and expenses of this suit, including an attorney fee to Harry W. Koons, for legal services in the prosecution of this suit, not to exceed $.....................